Next case on our call this morning is agenda number 3, number 129054, People of the State of Illinois v. Jessica Logan. Counsel for the appellant, are you prepared to proceed? Good morning, ma'am. Good morning. My name is Gilbert Lentz, I'm from the Office of the State of Health at Hunter. I'm here on behalf of Jessica Logan. Your Honor, the question before this jury was a question of fact. It was whether J.C.'s death was a homicide or an accident. When Dr. Denton completed his autopsy of J.C., he did not know the answer to that question. He left that question open and decided to seek more evidence. He asked a detective to obtain a video-recorded reenactment of the child's death performed by the mother, Jessica Logan. The next thing we know that happened is that the DCFS investigator, Investigator Tate, told Jessica Logan that she needed to do this reenactment, that she needed to do this in her former apartment where she no longer lived, in J.C.'s bedroom, the most distressing possible venue. Tate never told Jessica she was free to refuse, despite that Jessica made it clear, as the appellate court correctly found, that she did not want to do this. Next step, the detective calls Jessica, asks to set up an appointment for this reenactment. He tells Jessica that it's the doctor who requested this reenactment, never mentioning that this implicated her Fifth Amendment rights, implying that this is some kind of standard medical procedure. He never corrected the impression left by Tate's obviously coercive statement that Jessica needed to perform this reenactment. And then on the day of the reenactment itself, Jessica arrives at her apartment with Hope Taylor, her mother figure, greeted by five law enforcement agents. The agents keep Taylor out of the apartment, isolate Jessica in the apartment alone with five agents in the most distressing possible venue. How was that done? I mean, you make it sound like they said to the mother figure, you can't come in. Is that how it happened? Well, there's a little bit of divergent testimony on that, Your Honor. Hope Taylor herself testified that when she tried to enter the apartment with Jessica, the detective put his arm out and asked her to stay outside with the child, or may have said it would be better if he stayed outside. Matthews himself testified that he simply asked Taylor to stay outside to avoid distraction. Was there no suggestion that she was asked to stay outside to be a caretaker for the child instead of bringing the child into the reenactment? Matthews testified to that, certainly. His testimony was that why he asked Taylor to stay outside. But even if this Court accepts that testimony... I'm just asking exactly what happened, because I guess the child could have been brought into the reenactment or someone could have stayed outside with the small child, and I'm just trying to figure out whether you're suggesting that it was that the mother figure person was forcibly made to stay outside. That sounds like what you're suggesting. Well, the trial court came to that conclusion, Your Honor. The trial court, when it made its factual findings after the suppression motion, found that Detective Matthews kept Folk Taylor out of the apartment. Whether he explained... Whether he gave Ms. Taylor a reason for staying out of the apartment to avoid distractions to take care of the child, this Court should look to the effect of what happened.  The best option was to isolate Jessica from her family and then enter the most distressing possible venue for this encounter. And if both courts below correctly found, this factor weighs strongly in favor of her into custody. Counsel, you mentioned... It was suggested to your client that this was standard procedure, this reenactment. Is that true, and does that matter? Is it true that she was told that? Well, is it true that this is standard procedure, these reenactments? Well, I believe in forensic offices around the country, they do child death reenactments. The case on this is very sparse, as the Court well knows. Dr. Denton certainly testified that this is standard procedure. But the most important thing here, Your Honor, is that Jessica was told by Investigator Tate from DCFS not that this implicated her physical and mental rights, but that this was simply a process for the investigations to go forward and that she needed to participate. Similarly, when Detective Matthews called Jessica on the phone, he merely said that it was the doctor who requested the reenactment. He didn't say anything about... So the fact that he told that Jessica was the doctor who requested the reenactment, I think implies that this is kind of a standard medical procedure, just a process as Tate called it. The point is, Matthews on that phone call never corrected the impression left by Tate's initial statement that Jessica needed to do this reenactment, as he fellow court correctly found that obviously coercive statement. So you're suggesting that Jessica was actively misled into doing this reenactment, right? Yes. Yes. And that's why this claim implicates not only Miranda but also our Constitution because if this Court agrees with the appellate court's judgment that this record allows a reasonable inference of not just a Miranda violation but a deliberate circumvention of Miranda by law enforcement, this Court should find not only the Miranda violation but also the Constitutional violation, and that implicates what should have been suppressed because the State did not just merely present a statement that was inadmissible under Miranda. The State obtained direct evidence from that statement consisting of Dr. Denton's opinions. Dr. Denton updated his opinion. According to his trial testimony, the question about the cause of death was no longer open after he watched the video, this inadmissible video. This video has obtained a violation of Miranda. He testified to the jury after he watched the video that his conclusion was now that it was a smothering death, not mere asphyxiation by an unknown cause. Were there any words she used or actions that she took that would indicate or support a conclusion that she did not feel free to leave the interview? Well, the point that the Court first, to the first encounter with Investigator Tate, Tate herself testified about Jessica's demeanor during that encounter and described her as very upset about the idea of going back to her apartment where she no longer lived. As the Appellate Court correctly found, by that point in time, Jessica had already made it clear to law enforcement that she did not want to participate in this reenactment and that she merely acted yes in the request for the reenactment because she was told she needed to do so by Investigator Tate. And Detective Matthews, importantly, who definitely knew what this encounter would be, he knew he was going to be asking Jessica questions as part of a homicide interrogation. Detective Matthews, whether he knew what Tate told her or not, I think is irrelevant for purposes here. He never corrected that impression. He never told her that she was free to refuse and, of course, never randomized her. Was anything else said to Jessica that would suggest that she had to go and participate in this reenactment? Besides Investigator Tate? Right. Besides Investigator Tate. Tate told her that she needed to do it. I think Matthews' phone call with Jessica implied that her participation was required in the sense that it was requested by the doctor, that it sounded more like a routine medical investigation. Was there some insinuation that something might happen to her other child if she didn't attend? Well, she knew, certainly, that when a DCFS investigator tells her she needs to do something, her response puts her at risk of losing her 4-year-old son, certainly. And that's part of the reason why the appellate court came to the very strong word of conclusion that Tate's encounter with Jessica was obviously coercive. It wasn't just that Tate, in passing, said you needed to do this. There was a power dynamic here. Tate knew, I'm sorry, that Jessica knew that Tate had some authority over her and could affect her family. It certainly, there's no evidence in this case that she was directly threatened with having her other child removed, but Jessica had prior DCFS involvement. She knew what DCFS, what authority DCFS had, and that was hovering over this encounter as the appellate court found it. Counsel, let me skip ahead a little bit. If this, say we found that Miranda was violated, exactly what evidence would be subject to suppression? Well, the answer to that, I think, is a two-part, Your Honor. It does depend, I think, first on whether this court goes on to also find there was a Fifth Amendment or Fourth Amendment violation due to, for counsel's failure to raise those claims. If this court agrees that this was not just a Miranda violation but also a constitutional violation, then there's no question that the reenactment video itself would have to be suppressed, but also Dr. Denton's opinions that were based solely on that video, and that was absolutely crucial evidence. I would also add, Your Honor, though, that even if this court finds this case falls somewhere in between a Miranda violation and a constitutional violation, this court still should suppress Dr. Denton's opinions that were based solely on the reenactment video. Could I go back to the first piece, kind of set up the framework of what we're talking about here? You both talked about coercive and Miranda, and you just said the court could do either one or whatever. Let's just kind of go back to what happened procedurally. I'm looking about this procedure. There was a motion to suppress file in this case to address all, to talk about the facts that you're presenting here today. And my understanding is that that motion, the basis of the motion was that because of the nature of the police activity that the duty to Mirandize, to introduce the ideas of Miranda ideas, were triggered, and because she did not receive the Miranda warnings, therefore, all of this should be suppressed. I think that's correct about what happened in the trial court. And the trial court denied that motion. Is that right? With one correction, Your Honor, which is that counsel did not request suppression of Dr. Denton's opinions. Okay, I'm not there. I'm just about, what was the issue? The issue was Miranda. Yes. And the trial court denied the motion after hearing all the evidence. And then we wrote about what happens after trial before a case, an issue can be raised later on. And one of our rules is that in order to preserve an issue for appeal, and the only issue was Miranda at the time, is that the defense counsel would have to include that in a post-trial motion to preserve that appeal for further review. And, again, defense counsel did not do that. So under our rules, that issue could not be preserved, it wasn't preserved and therefore could not be raised again, except for some very limited situations. Am I right so far? Mm-hmm. Okay. So what I want to talk about is what are we talking about here? What are the situations that relieve this problem that the counsel did not follow the rules in terms of preserving appeal? It seems like there are two ideas, maybe two of them. That's two parts, but one would be, was counsel ineffective for not including that in the post-trial motion? And we know that that's your argument. Then we have to look at all the evidence to see if there was any prejudice there. Or maybe you're arguing that this is what we call plain error, and that we get to look at an issue that's not been preserved only if the – in two ways. Only if the evidence was closely balanced. So we'd have to look at all the evidence again. Or maybe it was plain error because it was structural, this idea of important constitutional issues. So just taking it through that, I'm talking about what is the lens we're talking about, looking at all this. What is your argument here? Why should this court look at an issue that was clearly not preserved in the trial court? Well, I think Jessica's first position is that it was sufficiently preserved. This court should not find the claim forfeited. And that's true for two reasons. It's true that counsel, even after litigating, fully litigating this Miranda claim and obtaining the ruling from the judge that indicated it was a close call, he did fail to include the one-sentence claim in the post-trial motion that would have definitely preserved this. But even so, this court should not find this claim forfeited, first and foremost because the law on what Miranda was, the nature of Miranda, whether it was a constitutional violation or not, was unclear in 2020 and 2021, such that counsel in this position could have, in that year, could have reasonably believed that his pre-trial motion was sufficient to preserve the Miranda claim because he could have reasonably believed at that time, based on recent case law, that Miranda was rooted in the Constitution. So this claim would fall under the exact same exception that this court found in Cregan, the constitutional exception to the failure to raise a claim in a post-trial motion. The second, I'm sorry, the second point on that is that this court may excuse the Miranda claim for a misforfeiture when fundamental fairness and justice requires. And this is the kind of case where this court should excuse for. Kagan. So we're talking the same language. Plain error, structural error. Is that what you're talking about? Not yet. Okay. So we're all on the same page. Right now. So is this structural error such that despite, if we assume this issue was forfeited, that because of the nature of the error, we're just going to look at the error, we're not going to look at the rest of the evidence? That's how you want to, the lens through which you want us to analyze this case, correct? That's the fourth argument why this claim should find a Miranda violation and remain for a new trial. The first two that I just addressed are that this court should not find the claim forfeited at all and should hold the State to its burden to prove this was a harmless error beyond a reasonable doubt. But, yes, Your Honor, if this court isn't fined. Did it's harmless error beyond a reasonable doubt? Is that what you're saying? If this claim, if this court finds that the claim is not forfeited and preserved, then the State's burden is to prove the Miranda violation was harmless beyond a reasonable doubt. That's our first position. Alternatively, if this court is inclined to find that the Miranda violation was forfeited, then we turn to the plain error doctrine. And both prongs are before the court. The first prong, as Chief Justice Tice noted, is whether the evidence was closely balanced, raising a reasonable probability of a different outcome. And the second is whether this particular Miranda violation constituted structural error rising to the level of second-pronged plain error requiring a new trial, regardless of the strength of the evidence. So there are many reasons why this court should remain for a new trial, based on the Miranda violation. But the primary reason is that this Miranda violation was extremely prejudicial. This was a case where the jury was tasked, should have been tasked, with deciding, with weighing the strength of the State's circumstantial evidence and Dr. Denton's credibility against the credibility of Jessica and the defense witnesses. The jury never should have heard the reenactment, never should have seen the reenactment video. They never should have heard Dr. Denton's opinions that were based solely on that reenactment video, which, by the way, not only were him changing his opinion to firm up that this was a homicide, as the State argued in closing, but he actually gave an expert opinion to the jury, based on the video, that Jessica's statements and actions in the video could not have been true. It would be hard to imagine a more prejudicial piece of evidence, based on an in-missile statement, that the jury never should have heard. A fair trial here should have been about the State's circumstantial evidence and the credibility of Dr. Denton in his more limited opinion testimony, weighing that against Jessica's credibility. That's the fair trial that Jessica Logan should get, and that's why this court should remain for a new trial. If we were to find that the claim was not properly preserved and it was forfeited, and we looked at plain error, under the closely balanced, I mean, are you arguing this case is closely balanced just to the credibility contest, and therefore, with the evidence presented that we should then send it back because the evidence is closely balanced? Are you saying that it meets structural error, or are you saying that it qualifies under either? Yeah, it qualifies under both. We addressed the first problem, plain error. The evidence, there's a reasonable probability that a different outcome on this record had the Miranda violation not occurred because of the weight. The evidence that shouldn't have been amended was already extremely prejudicial, as this court has said many times. When you admit a defendant's statement improperly, that's some of the most damning evidence that a jury can hear. So it's already presumptively not harmless. But here, the state told the jury, the state explicitly told the jury in the closing argument, you may have doubts about the circumstantial evidence. You know how you resolve those doubts? You look at Dr. Denton's opinions, and those, especially the opinions that were based on the reenactment video. Those, the jury never should have heard. There's certainly a reasonable probability of a different outcome had the jury not heard that and had the state not been able to make that argument. One last thing for my picky kind of lens we're talking about. At some point, you also talk about ineffectiveness of counsel failing to raise a different argument, not she did not receive her Miranda warrants, but, in fact, this was coercive and voluntary, right? Isn't that a brand-new argument? I mean, it certainly wasn't raised in the trial court in any way. Definitely. Where is that coming from? Trial counsel is ineffective. It's a... Did you raise that? Let me ask this. Did you raise that in the appellate court? Yes. Yes. It was, we raised in the appellate court trial counsel's ineffectiveness for not adding to this pretrial motion the constitutional claims, not only that this was a Miranda violation, but that this state obtained this reenactment video in violation of both the Fifth and the Fourth Amendments. Courts, appellate courts, often are presented with claims like this where trial counsel is ineffective for not filing a motion to suppress, and the question is whether that motion to suppress would have been granted, and if so, whether there's a reasonable probability of a different outcome. So it's very similar to the first chronic plain error test that this court would apply to the Miranda violation if it finds that claim in Fourth Amendment. No further questions at all? Okay. Thank you. Counsel to the appellate. Please record, counsel. I'm Assistant Attorney General Josh Schneider on behalf of the people of the state of Illinois, and I'd like to start with the question of the standard of review because this morning has shown the length through which we review a claim is really critical to determining how it comes out. And here it defends a primary claim, which is that her statements to Detective Matthews at her home were taken in violation of Miranda. That claim is reviewed only for plain error because it was not preserved below. Defendant had to raise that claim in her written post-trial motion because she didn't. It can only be reviewed for plain error. Now, defendant argues that it was not necessary to preserve the claim in her written post-trial motion because a Miranda violation, at least between, I guess, 2000 and 2022, was arguably a constitutional violation. Before that, it was not. After that, it was not. But during that period, it was. But that's incorrect. This court recognized very clearly back in the early 90s in Winsett that a Miranda violation is not a constitutional violation because Miranda's prophylactic warnings are not very constitutional rule in that they are prophylactic to protect the constitutional right. They're not themselves a constitutional entitlement. And so the violation of the Miranda warning requirement has consequences for the omission of evidence, but it's not itself a constitutional violation, and that's why it needs to be preserved. Moreover, the case law was not nearly so confused as defendant suggests. I believe the precedent the defendant relies on for that suggestion is Dickerson in 2000, but all that Dickerson did, of course, was recognize that Miranda was a constitutional rule in the sense that Congress could not displace it through legislation. The Supreme Court had announced this constitutionally-based rule as a prophylactic to protect the right against compulsory self-incrimination under the Fifth Amendment, and Congress could not say, no, ignore that. We passed it with statute. But it's been very clear for decades that Miranda is a prophylactic rule, not a substantive constitutional right. And so for that reason, the claim of a Miranda violation is reviewed only for plain error, and that means the question before the court is not whether was defendant in custody when she was asked these questions, but was she so clearly and obviously in custody that the trial court plainly erred by finding to be contrary. And defendant cannot make that showing. And I'd now like to turn to one other sort of doctrinal question, which is what does it exactly mean to be in custody? Because it's not simply a question of nose-counting. Of course, it's a totality of the circumstances test. We look at all the circumstances to tell whether someone's in custody, but we need to know what custody means to determine whether all of those circumstances add up to custody. And this is what custody means, as this court articulated in People v. Slater, is whether a reasonable person, innocent of any crime, would believe under the totality of circumstances that they could terminate the encounter and were free to leave. That has two components. One is that they were free to leave. That means that if a reasonable person believed that they were not free to leave, if they believed that they were under a restriction on their freedom of movement that was equivalent to formal arrest, then that element is satisfying. The second element is that they felt that they were not free to terminate the encounter, whereas they were not free to decline to answer the officer's questions, that there was a coercive atmosphere. So they would need to show that clearly, obviously, there was that kind of atmosphere of coercion, and their standard is that it is a level of sort of inherently coercive circumstances that are equivalent to the kind of stationhouse interrogation that was at issue in Miranda. And you need both of those elements. If there's just a restriction on the freedom of movement, but no coercive atmosphere, then it's not custody. That's, for example, traffic stops. There's no question when someone's pulled over for a traffic stop, they are not free to leave. But the U.S. Supreme Court has explained that that is nonetheless not custodial because it's not accompanied by the equivalent coercive atmosphere of a stationhouse interrogation. And the opposite is also true. If you had coercion, but no restrictions on movement, it's not custody for Miranda purposes. Imagine that I got an email from police saying, if you don't reply all confessing to this crime, then we're going to arrest your wife. That is quite coercive, and it may well mean that my response to that email is in violation of my civil right against compulsory self-incrimination. But I'm not in custody because there's no restrictions on my freedom of movement. So you need both. And here, we don't clearly and obviously have either because here it's not at all clear and obvious that a reasonable person in defendant's shoes would have believed that she was not free to leave if she wished. If you look at the circumstances in this case, she arrived under her own steam accompanied by Taylor and the four-year-old child. She was the one who had the key to the home, so she was the one who had control of access. When she went in, no one ever told her that she wasn't free to leave. No one ever physically restrained her. No one ever displayed a weapon or a use of force.  She never indicated that she wanted to leave. And at the end, she, in fact, did leave without any obstruction from the law enforcement and, in fact, didn't even comment from anyone in the room. She just walked out of the room. So it is certainly not clear and obvious that a reasonable person would believe that defendant was under sort of equivalent restraints on her movement to a formal arrest. And that alone is dispositive of defendant's Miranda claim. On plain error review, it is also, I would note, dispositive of her sort of related secondary claim that counsel is ineffective for not moving to suppress on the ground that she was seized under the Fourth Amendment, because, of course, the standard there is essentially the same. Would a reasonable person have believed under the totality of the circumstances that she was not free to leave? But she also cannot show that she was clearly and obviously under the equivalent coercive pressures that would be attendant to a station house interrogation. And here it's important that we sort of drill down on what coercion means in this context, because the defendant has mentioned that she was in the most emotionally distressing environment possible, the home where the child had died. And that may be true that it was a very emotionally distressing environment, but that is not necessarily relevant to the question of coercion, because coercion, for the purposes of the Fifth Amendment, is state coercion, coercion from official sources. And so there are all kinds of reasons that a person might be upset, but those reasons are not necessarily coercion. But more to the point, there are all kinds of reasons that a person might feel pressured to answer questions from an officer, and those reasons are not necessarily coercion. It's only if they originate from a state agent that they are coercive. Counsel, but here you've got DCFS investigators saying cooperation is needed, and she's got this 4-year-old child, and she's had to involve them. How is that not coercion? Sure. So, again, the question is whether this is sort of equivalent to a station house interrogation, and the defendant places a great deal of weight on the use of the word need by DCFS investigator Tate several days before this appointment for the reenactment. And the way it's been consistently referred to in this argument and also in defendant's briefs is that she was told she needed to participate, that she needed to do it. And when you look at the record, that simply doesn't bear that characterization out. And specifically, I refer the court to pages 48 and 51 of the recorded proceeding, where Tate says what she told defendant with respect to this reenactment. On page 48, she says, quote, We need to do a reenactment. We do that in all of our own child death cases. We need to. DCFS needs to. That's like if the police say, We need to ask you some questions. As the U.S. Appellate Courts, Circuit Courts in the 4th and 8th centuries explain, this sort of colloquial use of need is communication of the investigative agency's duty to inquire, to investigate. It is not a communication of, You, the person I'm talking to, have a legal obligation to comply. And that distinction is significant. But without her, how would they be able to do this reenactment? If they said, We need to do this reenactment and tell her that she needs to participate, how is it that without her involvement, I mean, that this would have been accomplished? So there's no question that the law enforcement's needs may not have been met. And that is always the case when someone declines to speak with police. The police say, We need to talk to you. If police show up at a scene of a crime and they're knocking on doors saying, We need to ask you what you saw. There was a shooting in the street. We're asking witnesses. If a person says, No, I'm not going to talk to you, that investigating officer's needs have not been satisfied, but that's fine. There is no obligation. So in this circumstance, rather than just the police saying, We need to do this, they employ the state agent from the Department of Children and Family Services, which isn't involved in the determination of death in all cases. This is another state actor being added. Do you say that that shouldn't matter or that doesn't add a layer? So it doesn't matter for a couple of reasons. One is no one told her, She needs to do this. They told her, These are the agencies involved in investigating this child's death, and I don't understand there to be any basis in the record to believe that DCFS was not involved in the investigation appropriately. DCFS, obviously, if a child dies in a home under suspicious circumstances and there's another child in the home, is appropriately involved in determining whether the other child can safely be there, although there's no evidence in the record that was ever approached with a defendant. So the use of the word need was not an imperative directed at a defendant. It was an explanation of the purpose for the reenactment. And if I could turn to page 51, again, Tate says, With respect to the need for the reenactment, I'll omit the you knows from this with your indulgence, I told her that's just a process for DCFS and for criminal investigation that both parties, i.e. DCFS and the criminal investigators, would need the reenactment to be able to better understand what happened in her home that night. So it was best to get this done so we can move forward in the investigation for both DCFS and for criminal. By saying it's best to get this done, that necessarily implies it is not the only option. There are other options. And it is not the kind of circumstance where they have said you can do this the easy way or the hard way where this is the best option because the other is implicitly some kind of adverse action taken by the state. The counsel, isn't the context within which that was suggested or requested by the DCFS investigators done in such a way that it didn't sound like she had an option? A reasonable person, since we're talking about what a reasonable person would understand, a reasonable person in her situation, having had contact with DCFS previously, knowing that she had another child in the home and whatever DCFS decided would impact on whether she got to keep that child, wouldn't and couldn't she have reasonably understood that to mean I have to participate in this? No, and this Court actually addressed that argument in People v. Slater. In People v. Slater, the defendant was, there was, DCFS was investigating a report of sexual abuse of a defendant's 11-year-old child in her home. I'm not talking about Slater. I'm just asking you with respect to the facts of this case. Right. Wouldn't she reasonably have concluded that she was required to participate? No. Under the totality of circumstances in this case. No. And with your indulgence again, the reason I point to Slater is Slater involved a DCFS agent who specifically told the defendant. I don't believe you're telling me the truth, and if I think that... I know what Slater said. I am not talking about Slater. I really am talking just specifically about the facts of this case. Your answer is no. My answer is no. And the reason my answer is no is because of Slater. In Slater, the DCFS agent said, I have the authority to remove the child from your home if I believe that the child is unsafe. They explicitly invoked their authority to remove the child, and this Court had no difficulty saying that is not a threat to remove the child. They're saying if we believe that the child is unsafe, then that is the next step that we would take. Here, even that was not made. There was no suggestion that DCFS investigator Tate mentioned her authority to remove a child. Now, it's true that the defendant had an interaction with DCFS earlier when she took the victim in for a bump on the head. DCFS investigated, found that there was nothing wrong, no one was at any fault, and dropped the matter altogether. So it's not clear why that prior interaction would have any additional coercive effect on a reasonable person in the defendant's shoes. Counsel, do you think you can be considered in a coercive environment when you're in the presence of three police officers, your family members are standing outside, you're in there all alone, and maybe the interrogation could have been done by one person? Well, the interrogation was done by one person. Only Detective Matthews asked her questions. But there were three officers in the room. There were two officers and Tate. But it wasn't a total of three officers? Not in the room, no. And if Your Honor is referring to Tate as well, then yes. There were two police officers who were not in uniform, were not armed. They did have badges. And there was DCFS investigator Tate who was wearing a red sweatshirt and jeans. But only Matthews asked questions. But when you're in the presence of these three state officials, you don't think that that might be considered coercive by someone who's never been involved in the criminal justice system? So the question that both this court and the U.S. Supreme Court said is relevant is not is there some coercive effect, but rather is the coercive effect the equivalent of an incommunicado station house interrogation? That's the threshold that has to be met for it to be sufficiently coercive to be custodial for the purposes of Miranda. So simply being and talking to three officers at the same time is necessary. But she is separated from everybody else. She's in this room in her former apartment by herself with the three state officials. So she was not accompanied by Tate or by Taylor. That's certainly true. And the record is, as Justice Kennedy-Pam in her questioning suggested perhaps, fairly clear that the reason that Taylor was not included was because they were accompanied by a 4-year-old child. Detective Matthews said, would you mind staying out here with the child unless there's not distractions during the investigation. And no one objected. The defendant didn't suggest that she felt uncomfortable without having this maternal figure there. And it is important to note that the defendant here is a 25-year-old woman. She is an adult. She has children. She lived alone. She had worked various jobs. This is not a circumstance where, for example, it's a juvenile suspect or a juvenile witness who's being asked questions outside the presence of a concerned parent. But even in those circumstances, this court has, again, had no difficulty finding that the absence of a parental figure alone doesn't render a questioning custodial for random purposes. But this is an adult who had a few challenges in school. She was not maybe the most intelligent person. And she's put in this situation where she's got to talk with these state officials. So I'm really glad you brought that up because it brings me to an important point, which is the Miranda custodial inquiry is an objective inquiry because, of course, Miranda is a prophylactic rule. The reason for the rule is to guide the actions of police. So conditions that a person may suffer from that are not apparent to the officers are irrelevant for the objective inquiry because there's no way for that to guide the officer's determination about whether a reasonable person under these circumstances would feel sufficiently in custody that the officer now needs to give them Miranda warnings to put them at their ease on that. But I would note that the only evidence in the record that defendant had any sort of learning disabilities or that sort of thing are that she did graduate from high school, she attended some college, and she had untimed testing, I believe it was, on some of her exams because she had a reading-related difficulty. But, again, turning back to Slater, there the defendant, who was interrogated at the Children's Advocacy Center, not in her home, in a room, again, with two officers who were armed but plainclothes and a DCF agent, as here, there she had a borderline IQ, and this court said, but that was not custodial. There was no reason to believe it. The circumstances around that questioning were essentially indistinguishable in terms of the coercive pressures a person feels from a stationhouse interrogation. But the one thing that is a little different here, this was the scene of the crime. Right. I do want to address that point because the defendant has argued again that, well, the environment is upsetting, but lots of interactions with police are in upsetting environments. Every time a 911 call is put in and officers respond, that is an extremely upsetting place for the person to be talking. Every time that police respond to the scene of a crime and talk to witnesses or the victim, that is an extremely upsetting circumstance to talk to someone. You just saw a crime. You're just a victim of a crime. If someone is called to come to the morgue to identify the body of a loved one, the morgue is a very upsetting place. But that is not coercive for the purposes of the Fifth Amendment. Let me ask you this question. Let's say we read the transcript at the trial of the motion to suppress, and we disagree with the trial court and we disagree with the appellate court's reading. What happens next? That's the question I have here. Sure. There was other evidence in this case. She testified that she, the child had been having difficulty breathing, she had medications that she was giving the child, and yet the doctor testified later that that was untrue. We know that there was this issue about she had a financial situation, she couldn't pay the rent, she couldn't pay the electricity, but she paid the life insurance on the child, and then right after the child died made a claim on life insurance. We know that she, and a dispute about this, she Googled how do you suffocate. She testified that that happened afterwards, where in fact the date stamp said it was before. There was a lot of other evidence in this case. What would happen if we disagree with the trial court and the appellate court? So if the court did not just disagree, but find that it was clearly and obviously incorrect by the trial court, then we would turn to whether it was first or second plumb plain error. It would be first plumb plain error if the evidence was so closely balanced that any error, no matter how apparently trivial it might be, could have tipped the balance. It is not what the defendants argued, whether there was simply a reasonable probability of a different outcome. It is that this is essentially an equipoise, such that any error could make a difference. And here there was ample evidence, really overwhelming evidence, that the defendant was guilty of the harm sign in this case. Very briefly, there was Dr. Denton's, I think that my lights got made, but I'll conclude my response briefly. Dr. Denton's expert testimony after doing a fairly thorough and methodical, if not exhaustive autopsy, was that the cause of death was smothering, that it could not have been done by the four-year-old. There was that the financial motive, the defendant was under great financial strain and had this $25,000 life insurance policy that she attempted to collect later that morning. The morning before the death, she searched on the phone, corroborated both by the phone and by Google's response to subpoena for how to suffocate. So this is not an instance where the evidence was essentially an equipoise, such that any error could have tipped the balance. Thank you very much. Thank you. Counsel Nobel. Thank you, Your Honor. Yes, the state had evidence of guilt in this case, circumstantial evidence. Jessica had a right to have the jury weigh that circumstantial evidence free of any inadmissible evidence that was both, that was overly prejudicial, and Jessica was denied that right in this case by multiple serious errors. Could we talk about, I know at the end of your earlier testimony, at the end of your presentation, you want to talk about the doctor's testimony. The doctor testified basically that after examining the child's body, he made some medical decisions about the amount of pressure that would have caused the damage that caused the death. We know the door, there was no sign of forced entry. The only people in the apartment were the mother and the 4-year-old, and the doctor testified that the 4-year-old is not large enough to apply the pressure that would have caused these damages. You were concerned about whether that, how we factor in that evidence. Well, much of Dr. Denton's opinion testimony would have come in at a fair trial, but I would point the court to his opinion testimony that the state told the jury was dispositive in this case, and that opinion testimony was, A, after watching the reenactment video, I concluded. Let's just talk about the doctor's testimony. It was admissible, correct? If we had to factor in the issues, as we do in a first-pronged claim error, as to whether it was close to balance, or even if we talk about ineffective assistance of counsel, we have to look at all the evidence and put it all together and try to make some decisions about the impact of any error. So we'd have to look at all the evidence. So is the doctor's testimony admissible evidence? Much of it would be, but in conducting the close to balance evidence analysis, this court should not include the evidence that it finds should have been suppressed. And within Dr. Denton's opinion, Dr. Denton's testimony, were two crucial opinions that should have been suppressed that the jury never heard. And the state told the jury that those two opinions were its most important evidence of guilt. They told the jury those two opinions are dispositive of this case, regardless of what you think about the other evidence. They actually urged the jury in closing arguments. You may have doubts about the circumstantial evidence. How do you resolve those? Look at Dr. Denton's opinion testimony. We're going to have to look at the evidence ourselves, right? Isn't that what happens in plain error or ineffective assistance of counsel? We have to look at the evidence and make some judgments. So I'm not sure how the arguments fit in. I mean, we'd have to look at what was the medical testimony, right? The question is whether the evidence would have been closely balanced, whether there's a reasonable probability of a different outcome, without the evidence that should have been suppressed. And the evidence that should have been suppressed included the opinion from Dr. Denton that changed his opinion from an open question to a homicide after watching the reenactment video. And most prejudicially of all, he testified that after watching the reenactment video, my opinion of Jessica's credibility, that could not have happened the way that she portrayed it in the video. That's some of the most prejudicial evidence that this court will ever see, I believe. And in light of the state's – it's already extremely prejudicial just on its own. But then the state told the jury that's dispositive in this case. There's – I don't think there's any reason in reading this record that there's not a reasonable probability of a different outcome had the jury been presented with what it should have been presented. What about the inconsistent – her inconsistent testimony that she was treating the child for respiratory problems and medication had been prescribed and that's how she was giving the medication to the child? And the doctor's testimony that rebutted that, that that wasn't true. How do we deal with that? There were – the state had circumstantial evidence of guilt. There were inconsistencies. The state was pointed out to the jury. The state would be free to do that at a new trial. But what the jury would not hear, what the jury should not have heard, had this been a fair trial, was the evidence that the prosecutors told the jury was its most important evidence of guilt. So a new trial would look – what a new trial would look like is that nothing about the reenactment would come in. Exactly. And if anybody's mentioned it in their earlier testimony, all that would be redacted. And what would happen would be it would be all of the other evidence that the state presented, correct? Yes. That's what a new trial would look like. Is that what you're asking for? Absolutely. Because the fair trial in this case would have been the jury hearing the state's circumstantial evidence, which had every right to present, combined with Dr. Denton's more limited opinion testimony. Dr. Denton would have told the jury at a fair trial, at a new trial, he would tell the jury, I acted the autopsy, I did not know how this child died. It was asphyxiation, but I don't know whether it was a homicide. I don't know whether it was an accident. The implications for the state's ability to prove its case when the doctor testifies to that in a murder case are obvious. And even if this court is inclined to find the circumstantial evidence strong, this is the kind of case where the errors on the other side are so severe, particularly in light of the state's opposing argument, that this case demands a new trial. In a new trial, would the jury hear the evidence about her Googling how to suffocate and her statement that she Googled that after the death when, in fact, the evidence showed she was not telling the truth, that it was before the child died? Would that come before the jury if we ran it up for a new trial? There's nothing in the state's case that I haven't already identified that I'm saying would be suppressed in a new trial. We don't know what happened, in fact, in the trial proceedings with a lawyer who vetted the state's exhibits and put them to the proper test before the trial. But I'll presume for the moment that the jury would be able to hear the Google search evidence. But these items of circumstantial evidence are not overwhelming, especially in this particular case because of how the state handled the inadmissible evidence. The prosecutor in closing argument told, in addressing their circumstantial evidence, the prosecutor told the jury, paraphrasing, you may have doubts about our circumstantial evidence. We think it's strong, but you may have doubts about it. The way to resolve those doubts is to look at Dr. Denton's opinions based on the reenactment video. Was the jury also told about the father's statements? He was incarcerated. Apparently all of his statements were recorded between him and the defendant. And there was a great deal of discussion about money, that he was asking for money so he could buy an MP3 player while he was in custody in the prison and that kind of thing. And she was saying, I can't afford a gas or electricity or rent or food. And the discussion they had together was, we have to keep up the life insurance policy on this child. And then immediately after the child's death, she calls the insurance company. Would the jury hear that? The jury would. The state was allowed to present evidence of motive, and barring an unforeseen pre-trial motion, they would probably be allowed to present that evidence at a new trial. But the evidence on the motive in particular was less strong for the state because Hope Taylor testified that it was her idea to call the insurance company to put the claim in. So the insurance evidence certainly alone was not overwhelming. And again, I'll point the court to the state's closing argument. The state told the jurors, the prosecutor actually urged the jurors in their deliberations, if you encounter a fellow juror who has doubts about our circumstantial evidence, ask that juror why they disagree with Dr. Denton. That's how the prosecutor urged the jury to decide this case. This is not a case where the state was focusing on the circumstantial evidence that we're discussing now. The state was telling the jury, you can convince, you can convict on the individual evidence alone. It's hard to imagine a more prejudicial evidentiary error in argument. For those reasons, Your Honor, we would ask that you reverse the judgment of the appellate court and remand for a new trial. Thank you, Mr. Counsel. Thank you both. This case, Agenda Number 3, Number 129-054, People of the State of Illinois v. Jessica Lowden. Montague is under advisement.